IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 24, 2003 Session

## KELVIN WADE CLOYD v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Washington County**
**No. 25404     Robert E. Cupp, Judge**

---

**No. E2003-00125-CCA-R3-PC**
**November 3, 2003**

---

The post-conviction petitioner, Kelvin Wade Cloyd, was convicted of two counts of vehicular homicide and possession of a controlled substance. After appointment of counsel and a hearing, the post-conviction court denied relief. In this appeal of right, he asserts that he was denied the effective assistance of counsel at trial and on appeal and that the state withheld evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed**

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID H. WELLES and NORMA MCGEE OGLE, JJ., joined.

Douglas A. Trant, Knoxville, Tennessee, for the appellant, Kelvin Wade Cloyd.

Michael E. Moore, Solicitor General; David H. Findley, Assistant Attorney General; Joe Crumley, District Attorney General; and Dennis Brooks, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On the night of October 8, 1995, a car driven by the petitioner was involved in a head-on collision with a vehicle occupied by the victims, Paul Lehew and Charles Garland. The victims were killed instantly. Officers who investigated the accident found forty-two Valium tablets in the petitioner's pocket. The petitioner tested positive for the drug. At the time of the accident, the petitioner's blood alcohol concentration was between .097 and .108%. Other pertinent proof appears in the opinion of this court on direct appeal:

> [T]he [petitioner] and Randy Loyd went to Ray's Market (Ray's), a beer store and drinking establishment. They drank beer. Later, the [petitioner], Loyd, and an employee of Ray's, Glenda Sue Sams, went to a restaurant to eat dinner. They ate

dinner and had beer or mixed drinks. They returned to Ray's at approximately 11 p.m. The victims, Lehew and Garland, were at Ray's drinking beer.

Loyd left Ray's before the appellant. Loyd testified that he tried to convince the [petitioner] not to drive because the [petitioner] was not "in good enough shape to drive." Loyd testified that Ms. Sams and the proprietor of Ray's, Laura Prescott, also tried to convince the appellant not to drive. Loyd rode with Lehew and Garland to the [petitioner's] house so that Loyd could get his vehicle. Lehew and Garland were supposed to meet Loyd at Loyd's house to go to a party together. Lehew and Garland never made it.

The [petitioner] plowed head-on into the vehicle occupied by Lehew and Garland. The [petitioner] was driving a pickup truck. Lehew was driving a Mazda car. Lehew's lower body was pinned inside the car. Garland's body was thrown approximately twenty feet from the car. The [petitioner's] truck turned on its side. He suffered minor injuries.

\*     \*     \*

The primary issues at trial were whether the [petitioner] was intoxicated, and, if so, whether his intoxicated state was the proximate cause of the deaths of the victims. Dr. Kenneth Ferslew, a forensic toxicologist, testified to the laboratory reports of the [petitioner] and Lehew, the driver of the Mazda car. The [petitioner's] blood-alcohol level when he was tested after the accident was .06. Dr. Ferslew testified that the [petitioner's] blood-alcohol level at the time of the accident was between .097 and .108. The [petitioner] also had a blood-level concentration of diazepam or Valium in his system. Dr. Ferslew testified that the concentration of diazepam in the [petitioner's] blood was in the therapeutic range as opposed to a toxic range. The therapeutic effects of diazepam include reduced anxiety, muscle relaxation and sedation. He further testified that mixing alcohol with diazepam would have increased the effects of both drugs on the [petitioner], causing a greater impairment than either substance alone would have caused. Dr. Ferslew testified that, in his opinion, the [petitioner] would have been impaired from the alcohol and diazepam at the time of the collision.

\*     \*     \*

Lehew's blood-alcohol level was .03. Lehew's blood drug screen was positive for marijuana, cocaine, and a therapeutic level of diazepam. Marijuana was found in Lehew's possession.

The state produced evidence to establish that the [petitioner's] truck crossed the center line on the highway, entered the victims' lane, and collided head-on with the car. The state's reconstruction of the accident was based primarily on gouge marks and scratches in the pavement, the damage to both vehicles, the location of the damage to the vehicles, and debris left at the scene. The defense presented expert

testimony to establish that the state's theory was flawed. The expert testified that in his opinion there was no way to tell which vehicle crossed the center line.

The parties stipulated that the headlights on one side of the Lehew vehicle were not operating at the time of the collision. The defense presented evidence from which the jury could have concluded that none of the headlights on the Lehew vehicle were operating. There was evidence that the [petitioner] was speeding at the time of the collision.

State v. Kelvin Wade Cloyd, No. 03C01-9704-CR-00153, slip op. at 2-5 (Tenn. Crim. App., at Knoxville, April 2, 1998).

A jury returned guilty verdicts of two counts of vehicular homicide and possession of a controlled substance. The statute required proof beyond a reasonable doubt that the petitioner was intoxicated at the time of the accident and that intoxication was the proximate cause of the victims' deaths. On direct appeal, this court affirmed. See id.

On May 19, 1999, the petitioner filed a pro se petition for post-conviction relief alleging, among other things, that the indictment was invalid and that he was deprived of the effective assistance of counsel at trial. Although the post-conviction court initially dismissed the petition on procedural grounds, see Tenn. Code Ann. § 40-30-204(e), the petitioner retained counsel, amended the petition, and was granted an evidentiary hearing.

Mary Bearden, who lived near the scene of the accident, testified that she had heard two separate crashes, approximately one to two minutes apart. She recalled that when she went to the scene, she observed the petitioner bleeding from the head. Another neighbor, W.A. Maloney, testified that he had also heard two collisions.

According to Denna Hardin, the victim Lehew had telephoned her several times on the day of the accident asking her to go to a party. After she eventually agreed to attend, Lehew and Garland arrived at her residence between 6:00 and 8:00 p.m. Ms. Hardin testified that both victims had been drinking and that there was a cooler containing alcohol in the back seat of their vehicle. She recalled that Lehew had a bottle of Valium.

Three of the petitioner's cousins, Richard, Max, and Mike Cloyd, testified regarding a third vehicle that was believed to have been involved in the accident. Richard Cloyd, who was at the accident scene, described the petitioner as "shaken up" rather than under the influence of an intoxicant. He stated that the headlights of the vehicle occupied by the victims were out, but that the interior light was on. Richard Cloyd contended that at the time of the accident, a man named Randy Lloyd drove a vehicle which looked like a Grand Am or Thunderbird and that the car had disappeared immediately after the accident for about a month before resurfacing with a "primered front end." While Max Cloyd acknowledged that he did not get close enough to the accident scene to determine whether the headlights of the victims' vehicle were on, he stated that he was "pretty

sure" they were not. Mike Cloyd testified that Lloyd drove a Thunderbird that "disappeared for about six months" after the accident before reappearing with a "white clip on the front of it."

Beryl Cavin offered similar testimony. John Matthews, Jr., who knew Randy Lloyd, overheard him say that "he was not going to jail over anyone." Dallas Cloyd, the petitioner's father, testified that he had informed the petitioner's trial counsel about "some" of those witnesses, but that none had been called to testify at the trial.

The petitioner's trial counsel, who had practiced law for approximately thirty-five years, testified that prior to trial, he had visited the scene of the accident several times and canvassed the area for potential witnesses. While having interviewed some of the witnesses who had testified at the post-conviction hearing, he conceded that he was not aware of others, particularly the members of the petitioner's family. Although trial counsel also acknowledged the possibility that a third vehicle was involved in the accident, he contended that no one had identified Randy Lloyd as the possible driver. He recalled that he had interviewed Lloyd extensively prior to trial, but that he had provided a statement "devastating" to the defense. According to trial counsel, both the defense expert and the trooper who investigated the accident contended that if there was a third vehicle involved, it was insignificant relative to the impact between the petitioner's vehicle and that of the victims.

During cross-examination, trial counsel acknowledged that access to the victims' vehicle, which had been destroyed, would have assisted the defense's accident reconstruction expert. He stated that the prejudice was minimal, however, because the state, based on a filament examination by its own experts, stipulated that the headlights of the victim's vehicle were not on at the time of the accident. Because the accident occurred late at night on a poorly lit road, trial counsel pointed out that the lack of headlights was "a big part of [the] defense." In his opinion, those witnesses who could have testified to the extent of the petitioner's injuries would not have benefitted the defense because "[t]hat was never a question." Trial counsel recalled that "[t]here wasn't a strong line . . . of testimony that [the petitioner] was intoxicated to any great extent at the scene." He stated that while Denna Hardin's testimony may have been helpful, he was not made aware of her knowledge of the accident at any time prior to trial. Trial counsel also testified that he knew that a third vehicle was involved in the accident, but stated that until the post-conviction hearing, no one had identified Randy Lloyd as the driver. He acknowledged that he did not move to suppress the petitioner's statement to police, his blood sample, or the money and Valium pills found in his possession but asserted that there was no legal basis for such a request.

The post-conviction petition and three amendments included fifty-five separate grounds for relief, including various allegations of ineffective assistance of counsel. In a thorough twenty-seven-page order, the trial court denied the petition, making the following observation:

[T]his [c]ourt has no other alternative except to conclude that trial counsel's performance for the services rendered in this case are within the range of competency demanded of attorneys in criminal cases. [T]his court finds that the petitioner has

failed to prove a deficiency and has failed to show that trial counsel's acts or omissions were of such a serious nature to fall below an objective standard of reasonableness under prevailing professional norms. It is not this court's place to "second guess" tactical and strategic choices pertaining to the defense of this petitioner, and this court refuses to measure defense counsel's representation by "20-20 hindsight."

Furthermore, this court is not convinced from all the evidence presented, along with the transcript of the trial, that there is a reasonable probability that, but for counsel's unprofessional errors the result of the proceeding would have been different.

The trial court also cited the opinion of this court on direct appeal:

We reviewed this record thoroughly, paying close attention to the evidence of how the collision occurred. Both the defense attorney and the assistant district attorney did an excellent job of presenting the proof to the jury in this case . . . .

Kelvin Wade Cloyd, No. 03C01-9704-CR-00153, slip op. at 6.

In this appeal, the petitioner cites no fewer than eighteen instances of alleged ineffective assistance of counsel and contends that he should be granted a new trial. He also argues that a new trial is required because the state withheld evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963).

I

Initially, the petitioner contends that he was denied the effective assistance of counsel at trial and on appeal. When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given were below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Second, he must show that the deficiencies "actually had an adverse effect on the defense." Strickland v. Washington, 466 U.S. 668, 693 (1984). Should the petitioner fail to establish either factor, he is not entitled to relief. Our supreme court described the standard of review as follows:

Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component.

Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

On claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Under our statutory law, the petitioner bears the burden of proving the allegations in his post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. State v. Honeycutt, 54 S.W.3d 762, 766-67 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). On appeal, the findings of fact made by the post-conviction court are conclusive and will not be disturbed unless the evidence contained in the record preponderates against them. Brooks v. State, 756 S.W.2d 288, 289 (Tenn. Crim. App. 1988). The burden is on the petitioner to show that the evidence preponderated against those findings. Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978). The credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the trial court. Bates v. State, 973 S.W.2d 615 (Tenn. Crim. App. 1997). When reviewing the application of law to those factual findings, however, our review is de novo, and the trial court's conclusions of law are given no presumption of correctness. Fields v. State, 40 S.W.3d 450, 457-58 (Tenn. 2001); see also State v. England, 19 S.W.3d 762, 766 (Tenn. 2000).

The petitioner first contends that trial counsel was ineffective for failing to call as witnesses at trial the individuals who testified at the post-conviction hearing. The state contends that the petitioner failed to prove that trial counsel was ineffective for failing to discover those witnesses prior to trial and that, in any event, their testimony would not have produced a different result.

The post-conviction court accredited the testimony of trial counsel and found, contrary to certain of the testimony, that he had interviewed every witness whose identity was known or should have been known to him prior to trial. The petitioner's father testified only that he had discussed "some" of the witnesses with trial counsel prior to trial and was not specific about their identities. Trial counsel testified that he had, in fact, interviewed several of the witnesses and had canvassed the neighborhood for others, but that some, such as the petitioner's family members, did not step forward prior to trial to reveal any knowledge of the accident. Although trial counsel conceded that the testimony regarding Randy Lloyd, the likely driver of the third vehicle, might have "helped" the defense, he did not learn of that testimony until the day of the post-conviction hearing. The failure to discover every potential witness does not necessarily mean that counsel was ineffective. Reasonable diligence is the appropriate standard. In this instance, the trial court accredited the testimony of trial counsel that his efforts to identify every possible witness favorable to the defense met professional standards.

Of greater importance is that the petitioner has failed to show that any error by trial counsel in failing to discover or utilize the various witnesses he has identified resulted in prejudice to the defense. Two of the witnesses, Mary Bearden and W.A. Maloney, would have testified that they heard two crashes on the night in question. A number of the others, Richard Cloyd, Mike Cloyd, Beryl Cavin, and John Matthews, would have implicated Randy Lloyd as the driver of the third vehicle that might have been involved in the accident. Because, however, both the investigating officer, a witness offered by the state, and the defense's retained expert agreed that the involvement of a third vehicle was insignificant in comparison to the initial impact between the petitioner's vehicle and that occupied by the victims, the additional information would not have been as significant as it might appear. [T]he petitioner did not introduce any evidence during the hearing which would indicate that the second collision contributed to the deaths of the victims. Thus, it would appear that trial counsel acted reasonably in relying upon the professional judgment of the two experts. Although Denna Hardin's testimony about the victims' use of alcohol and drugs on the day of the accident was relevant, the blood alcohol content of the victim driver, .0+3%, and the illegal drugs in his possession were admitted as evidence at trial. That the headlights of the victims' vehicle were not turned on was uncontested. In rendering its verdict, the jury was fully aware of that stipulation. Similarly, Max Cloyd, who testified at the post-conviction hearing that he was unsure of whether the victims' vehicle's headlights were on, would have added nothing of further benefit to the defense. In summary, it is our view that the failure to discover the additional witnesses or the failure to present others for trial did not have an adverse effect on the defense.

Next, the petitioner asserts that the accumulation of numerous other errors by counsel during the course of trial violated his constitutional rights. Specifically, he cites four separate grounds for a motion to suppress, ten objections to evidence that should have been lodged, two examples of unpresented evidence, and the failure to question on direct appeal the trial court's performance as thirteenth juror on appeal.

The petitioner specifically asserts that trial counsel was ineffective for failing to seek suppression of his blood sample, which he contends was obtained without his consent and without a warrant. As indicated, it was calculated that the petitioner's blood alcohol level was between .097% and .108% at the time of the accident. In support of his claim, the petitioner contends that his blood sample was drawn in violation of the four-pronged test identified by this court in State v. Jordan:

> a) The officer compelling the extraction of blood from the accused has probable cause to believe that the accused committed the offense of aggravated assault or vehicular homicide while under the influences of an intoxicant or drug, and there is a clear indication that evidence of the accused's intoxication will be found if the blood is taken from the accused's body and tested;
>
> b) Exigent circumstances exist to forego the warrant requirement;

> c) The test selected by the officer is reasonable and competent for determining blood-alcohol content;  and
>
> d) The test is performed in a reasonable manner.

7 S.W.3d 92, 99 (Tenn. Crim. App. 1999).  The petitioner argues that the officer who ordered a blood sample did not have probable cause to believe that he was under the influence of an intoxicant and that there were no exigent circumstances to support the lack of a warrant.  The state asserts that there was probable cause to compel the blood sample and that the natural diminishment of blood alcohol content over time justified proceeding without a warrant.

Officer Todd Davis, one of the first officers to arrive at the scene of the accident, testified at trial that in his opinion the petitioner was under the influence of an intoxicant.  He described the petitioner as unsteady on his feet and as having slurred speech.  The officer further saw that the petitioner was in a "dazed[,] confused state, almost like a stupor."  Trooper Dexter Lunceford detected a slight odor of alcohol and observed that the petitioner's eyes were glassy and his speech was slurred.  Although the trooper attempted to administer field sobriety tests, he was unable to do so because the petitioner claimed that his hip was sore and that he was unable to perform the tests.  In Trooper Lunceford's opinion, the petitioner "was very much under the influence of a combination of alcohol and/or drugs of some kind."

In our assessment, the trial court properly concluded that there was probable cause for investigating officers to believe that the petitioner was under the influence of an intoxicant at the time of the collision and exigent circumstances, i.e., the natural dissipation of alcohol in the bloodstream over time, were present.  It is our assessment that had trial counsel filed a motion to suppress on that ground, it would not have been successful.

Next, the petitioner asserts that trial counsel was ineffective for failing to move for the suppression of statements he made shortly after the accident while he was in the back seat of Officer Davis's cruiser.  He had not yet been advised of his Miranda rights.  During his investigation, Officer Davis had the following exchange with the petitioner:

> Out of pure emotion, I went to the car and opened up the car.  I asked [the petitioner] . . . out of anger . . . how it felt to know he killed two people.  His reply to me was, "All I care about is going to bed right now, man."  And he threw his head back on the back seat of the car.  I pretty much slammed the door out of disgust. . . .

In its order denying relief, the post-conviction court concluded that "the question by the officer and the statement of the petitioner [were] objectionable," but otherwise made no findings.  While the state does not address whether the failure to object to the testimony qualified as a deficiency in performance, it submits that admission of the statement did not affect the outcome of the trial.

The Fifth Amendment to the United States Constitution provides that "no person . . . shall be compelled in any criminal case to be a witness against himself ." U.S. Const. amend. V; see also Malloy v. Hogan, 378 U.S. 1, 6 (1964) (holding that the Fifth Amendment's protection against compulsory self-incrimination is applicable to the states through the Fourteenth Amendment). Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The significant difference between these two provisions is that the test of voluntariness for confessions under Article I, § 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992).

Generally, one must affirmatively invoke these constitutional protections. An exception arises, however, when a government agent makes a custodial interrogation. Statements made during the course of a custodial police interrogation are inadmissible at trial unless the state establishes that the defendant was advised of his right to remain silent and his right to counsel and that the defendant then waived those rights. Miranda v. Arizona, 384 U.S. 436, 471-75 (1966); see also Dickerson v. United States, 530 U.S. 428, 444 (2000); Stansbury v. California, 511 U.S. 318, 322 (1994). A defendant's rights to counsel and against self-incrimination may be waived as long as the waiver is made voluntarily, knowingly, and intelligently. Miranda, 384 U.S. at 478; State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992). In order to effect a waiver, the accused must be adequately apprised of his right to remain silent and the consequence of deciding to abandon the right. State v. Stephenson, 878 S.W.2d 530, 544-45 (Tenn. 1994). In determining whether a waiver was voluntary and knowing, the totality of the circumstances must be examined. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997). If the "greater weight" of the evidence supports the court's ruling, it will be upheld. Id. This court must conduct a de novo review of the trial court's application of law to fact. State v. Bridges, 963 S.W.2d 487 (Tenn. 1997); State v. Yeargan, 958 S.W.2d 626 (Tenn. 1997).

In Miranda, the United States Supreme Court limited its holding to a "custodial interrogation." Miranda, 384 U.S. at 478-79. The Court defined the phrase "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. at 444. A person is "in custody" within the meaning of Miranda if there has been "a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (citation omitted). The Court has refused to extend the holding in Miranda to non-custodial interrogations. See Oregon v. Mathiason, 429 U.S. 492 (1977) (holding that an accused's confession was admissible because there was no indication that the questioning took place in a context where his freedom to depart was restricted in any way); see also Beheler, 463 U.S. at 1124-25 (noting that the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest). In determining whether a reasonable person would consider himself or herself in custody, our supreme court considers a variety of factors, including the following:

the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method

of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

State v. Walton, 41 S.W.3d 75, 82-83 (Tenn. 2001) (quoting State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996)).

In our view, Officer Davis should not have been permitted to make reference to the statement at issue. The petitioner, the subject of a criminal investigation, was in custody when he was placed in the back of the officer's cruiser and was entitled to be advised of his Miranda rights prior to any interrogation, including that borne of emotion. Officer Davis candidly acknowledged his anger toward the defendant and his frustration with the casualness of his response. Despite his preparations, trial counsel was apparently unaware of the content of the officer's testimony prior to trial. An objection at trial would have been warranted and should have been sustained. In the context of the trial, however, any prejudice resulting from the admission of the statement was minimal. As Officer Davis went on to explain, the petitioner, due to his physical condition, was not likely to have understood the question. The real issue was whether any lack of sobriety on the part of the petitioner in the operation of his vehicle had caused the deaths of the victims.

In this same vein, the petitioner also complains that trial counsel should have moved to suppress statements he made at the jail regarding the alcohol and drugs he had consumed before the accident. At trial, Trooper Lunceford testified that when interviewed at the jail "some five hours" after the accident, the petitioner "finally admitted . . . to taking a couple of [V]aliums and drinking a couple of beers." The petitioner complains that he had not made a knowing and intelligent waiver of his rights at that time because he had not been "readvised" of his Miranda rights and because he was intoxicated. Although the post-conviction court did not specifically address the issue of whether counsel was ineffective for not filing a motion to suppress, it implicitly did so by ruling that counsel was not deficient for failing to lodge an objection during trial. The court observed that it was "not necessary . . . [for officers] to [have] re-advise[d] the petitioner of his Miranda rights" and that the petitioner did not establish that the level of his intoxication precluded admission of his statement.

The evidence does not preponderate against the post-conviction court's finding that the petitioner's statements at the jail were knowing and voluntary. The petitioner did not testify at the evidentiary hearing and there was no testimony about when the petitioner was provided Miranda warnings. Because the statement at issue was some five hours after the accident, his level of intoxication would have diminished. It is the petitioner's burden to prove his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-219(f). In our view, he has failed to adequately establish this alleged deficiency.

Next, the petitioner contends that trial counsel was ineffective for failing to seek suppression of the Valium pills found in his possession by Trooper Lunceford. Citing <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), he argues that because the trooper did not have probable cause for an arrest, the seizure of the drugs violated constitutional principles. The post-conviction court found that the issue was without merit because "the [p]etitioner voluntarily pulled the pills out of his front pocket."

Both the state and federal constitutions protect individuals from unreasonable searches and seizures; the general rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression. U.S. Const. amend. IV; Tenn. Const. art. I, § 7; <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 454-55 (1971); <u>State v. Bridges</u>, 963 S.W.2d 487, 490 (Tenn. 1997). An automobile stop constitutes a "seizure" within the meaning of both the Fourth Amendment of the United States Constitution and Article I, section 7 of the Tennessee Constitution. <u>Michigan Dep't of State Police v. Sitz</u>, 496 U.S. 444, 450 (1990); <u>Delaware v. Prouse</u>, 440 U.S. 648, 653 (1979); <u>State v. Binion</u>, 900 S.W.2d 702, 705 (Tenn. Crim. App. 1994); <u>State v. Westbrooks</u>, 594 S.W.2d 741, 743 (Tenn. Crim. App. 1979). The fact that the detention may be brief and limited in scope does not alter that fact. <u>Prouse</u>, 440 U.S. at 653; <u>State v. Pulley</u>, 863 S.W.2d 29, 30 (Tenn. 1993); <u>Binion</u>, 900 S.W.2d at 705; <u>Westbrooks</u>, 594 S.W.2d at 743. The basic question, as indicated, is whether the seizure was "reasonable." <u>Binion</u>, 900 S.W.2d at 705 (citing <u>Sitz</u>, 496 U.S. at 444). The state always carries the burden of establishing the reasonableness of any detention. <u>See State v. Matthew Manuel</u>, No. 87-96-III (Tenn. Crim. App., at Nashville, Nov. 23, 1988).

Among the narrowly defined exceptions to the warrant requirement is an investigatory stop. <u>See Terry v. Ohio</u>, 392 U.S. 1, 27-28 (1968). An investigatory stop is deemed less intrusive than an arrest. <u>See id.</u> In <u>Pulley</u>, our supreme court ruled that "the reasonableness of seizures less intrusive than a full-scale arrest is judged by weighing the gravity of the public concern, the degree to which the seizure advances that concern, and the severity of the intrusion into individual privacy." 863 S.W.2d at 30.

Our determination of the reasonableness of the stop of the vehicle depends on whether the officers had either probable cause or an "articulable and reasonable suspicion" that the vehicle or its occupants were subject to seizure for violation of the law. <u>See Prouse</u>, 440 U.S. at 663; <u>State v. Coleman</u>, 791 S.W.2d 504, 505 (Tenn. Crim. App. 1989). Probable cause has been generally defined as a reasonable ground for suspicion, supported by circumstances indicative of an illegal act. <u>See Lea v. State</u>, 181 Tenn. 378, 380-81, 181 S.W.2d 351, 352 (1944). While probable cause is not necessary for an investigative stop, it is a requirement that the officer's reasonable suspicion be supported by "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." <u>Terry</u>, 392 U.S. at 21; <u>Pulley</u>, 863 S.W.2d at 30; <u>Coleman</u>, 792 S.W.2d at 505; <u>see also State v. Watkins</u>, 827 S.W.2d 293, 294 (Tenn. 1992) (applying <u>Terry</u> doctrine in context of vehicular stop). In determining whether reasonable suspicion exists, an important factor in the analysis is that reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to

show probable cause. Pulley, 863 S.W.2d at 32 (citing Alabama v. White, 496 U.S. 325, 330 (1990)).

Courts considering the issue of reasonable suspicion must look to the totality of the circumstances. Those circumstances include the personal observations of the police officer, information obtained from other officers or agencies, information obtained from citizens, and the pattern of operation of certain offenders. Watkins, 827 S.W.2d at 294 (citing United States v. Cortez, 449 U.S. 411, 417-18 (1981)). Objective standards apply rather than the subjective beliefs of the officer making the stop. State v. Norword, 938 S.W.2d 23, 25 (Tenn. Crim. App. 1996).

The record here establishes that when Trooper Lunceford removed the petitioner from Officer Davis's cruiser, he noticed "a large bulge" in his right front pants pocket and asked him what it was. According to the trooper, the petitioner claimed that it was money and, while showing the officer "a rather large wad of individually wadded bills, U.S. currency," he also produced a clear plastic bag containing the blue pills. In our view, the record does not preponderate against the post-conviction court's determination that the petitioner voluntarily displayed the drugs. See State v. Boyd L. Jones, III, No. W2002-00827-CCA-R3-CD (Tenn. Crim. App., at Jackson, Mar. 26, 2003) (holding that trial court did not err by failing to suppress where the defendant had voluntarily produced the illegal drugs).

The petitioner next argues that trial counsel was ineffective for failing to make various evidentiary objections at trial. Specifically, he cites three instances during the testimony of Officer Davis, two during the testimony of Randy Lloyd, and five that should have been made during the testimony of Trooper Lunceford. With regard to Officer Davis, the petitioner contends that trial counsel should have objected to the following testimony:

Q  [W]hat did you do at that time?
A  Walked back up to the truck and noticed Mr. Cloyd standing along the side of the roadway with a laceration around the lip area, bottom lip and chin area of his face. He was bleeding. He was in what I would consider to be a dazed confused state, almost like a stupor.

*       *       *

A  . . . Out of pure emotion, I went to the car and opened up the car. I asked [the petitioner], I guess kind of out of anger as well, but how it felt to know he killed two people. His reply to me was, "All I care about is going to bed right now, man." And he threw his head back on the back seat of the car. I pretty much slammed the door out of disgust. . . .

*       *       *

Q  [D]uring your contacts with [the petitioner], did you have an opinion on his state of sobriety?
A  As far as being intoxicated by alcohol, I did not smell a strong odor of alcohol about [the petitioner]. . . . His state . . . was – he was unsteady on his feet. He [had] slurred speech and he . . . had the effects of being intoxicated without the smell. At

that . . . time . . . I didn't give him any tests to determine the state of his intoxication, but he <u>did appear to be under the influence</u> of something.

(Emphasis added.) The post-conviction court found that the officer's first statement, that the petitioner was dazed, was not objectionable because it was "nothing more than [O]fficer Davis testifying as to what he observed." It ruled that the next two statements were objectionable, but held that any error was harmless in the context of the entirety of the evidence.

In our view, trial counsel was not ineffective for failing to object to the officer's characterization of the petitioner as appearing "dazed" and "confused." Certainly the trooper was entitled to express his observations at the scene. The officer's description of the petitioner, that is, that the petitioner was unsteady on his feet, had slurred speech, etc., provided the jury with the basis for his assessment of the petitioner's mental state. The statements made by the petitioner while he was in the cruiser should have been excluded, as previously indicated. That the officer was disgusted at his response and slammed the car door after the petitioner's statements should also have been excluded. The response of Officer Davis was simply irrelevant. In context, however, the impact of the testimony was not so prejudicial as to require a new trial.

The petitioner also cites two instances of testimony by Randy Lloyd that should have been excluded:

Q   Did [the petitioner] have some of [the beers]?
A   I think he may have drunk one or two.
Q   Are you sure about that?
A   Well, I think so. I'm not real sure. It's been quite a while.
                    *       *       *
Q   Then what did you do?
A   Then I guess that was when we went to [the petitioner's] house to clean up to go eat, when we left there again.

The post-conviction court held that Lloyd's testimony about the beer was objectionable but harmless and that the petitioner's claim as to the second statement was "simply immaterial and meritless."

Although Lloyd speculated about the amount of beer the petitioner had consumed, it was qualified by his statement that his memory had been affected by time. Likewise, our review of the trial testimony reflects that the second statement complained of by the petitioner was not improperly admitted. Although the phrase "I guess" denotes speculation, it appears in this instance to have been a figure of speech indicating the best of his recollection. In our view, the petitioner would not be entitled to a new trial based upon the failure of trial counsel to object to either statement.

Finally, as regards the testimony of Trooper Lunceford, the petitioner alleges that there should have been three objections:

Q       Did you notice anything unusual about his person at this stage?
A       His mouth was dry.
Q       [W]hat is it that you observe[d] that [gave] you that opinion?
A       They will lick. They will even become chaffed around the edges as the interview transpires sometimes. He didn't at this particular time but often times they'll ask for water. And they'll continually try to moisten their lips because their mouth is not secreting fluids because of their nervousness and because they . . . put something into their system that's affecting it.

*       *       *

Q       And what did [the petitioner] say?
A       "Oh, I'm sorry."
Q       "Oh, I'm sorry."
A       In a rather sarcastic tone of voice.
Q       What do you mean by sarcastic?
A       Just like, "Well, I'm sorry." I couldn't see his facial expression but it was just in a monotone sarcastic voice.

*       *       *

Q       And during that time that you were with [the petitioner] . . . do you have an opinion on his state of sobriety?
A       I do.
Q       And what was your opinion, sir?
A       He was very much under the influence of a combination of alcohol and/or drugs of some kind, be it either prescription or illegal.

The petitioner also asserts that trial counsel was ineffective for failing to object when Trooper Lunceford testified that police never located the third vehicle involved in the crash and that he administered the horizontal gaze nystagmus test to the petitioner.

The post-conviction court held that Trooper Lunceford's testimony regarding the petitioner's mouth being dry "may have been objectionable, but it in no way prejudiced this petitioner in light of all the testimony in this case." In our view, the trooper's personal observation that the petitioner's mouth was dry was properly admitted. Although the state failed to properly establish any foundation for the trooper's related opinions, it is highly improbable that those comments affected the results of the case. The post-conviction court also found that the trooper's opinion regarding the petitioner's sarcastic tone of voice should have been excluded. Again, in the context of the entire trial, that did not prejudice the defense.

The post-conviction court agreed that "Trooper Lunceford should not have given an opinion as to the petitioner's state of intoxication without a basis for that opinion." It nevertheless concluded that any failure to object to that testimony was harmless because the results of the petitioner's blood test indicated the presence of alcohol and drugs. In our view, the testimony was admissible. A witness may express an opinion as to the degree of intoxication, if any, of a person that the witness has seen and observed. See Hopson v. State, 201 Tenn. 337, 299 S.W.2d 11 (1957); see also State

-14-

v. Wilburn E. Smith, No. 1069 (Tenn. Crim. App., at Knoxville, Oct. 26, 1988) (holding that police officer may give opinion testimony on state of defendant's intoxication). In this case, the trooper provided ample testimony concerning his observations of the defendant. The jury heard the facts upon which the testimony was based. In any event, however, it is our conclusion that the post-conviction court correctly determined that admission of the testimony was harmless in light of the other evidence of the petitioner's intoxication.

The post-conviction court made no findings as to the petitioner's claim that trial counsel was ineffective for failing to object to Trooper Lunceford's testimony that he and the other investigating officers were unable to locate the third vehicle involved in the crash. The petitioner asserts that "[a]s can be seen from the witnesses who testified at the post-conviction hearing, there was ample testimony as to where Randy Lloyd's vehicle, the [third] vehicle, was." He fails, however, to cite the evidentiary basis, if any, for an objection to the trooper's testimony or to otherwise demonstrate that the testimony was patently false. Because the testimony was admissible, trial counsel was not deficient for failing to object.

Furthermore, trial counsel was not ineffective for failing to object to Trooper Lunceford's testimony that he administered a horizontal gaze nystagmus test. The petitioner contends that there was no evidence that the trooper was qualified to perform the test. The post-conviction court found that there was no error because "Trooper Lunceford made no observations about any degree of intoxication based upon the test." The record clearly supports the finding made by the trial court.

Next, the petitioner asserts that trial counsel was ineffective for failing to impeach Trooper Lunceford with the accident report he had prepared, wherein the officer had indicated that it was unknown whether the petitioner had been drinking. While the post-conviction court found that the report would have been "an appropriate consideration for cross-examination," any omission in that regard did not impact the outcome of the trial. Any inconsistencies in the statement of a witness are fertile grounds for cross-examination. The entirety of the testimony may have offered a logical explanation. It is inconceivable that cross-examination about the omission in the accident report would have resulted in a different verdict.

The petitioner also asserts that counsel was ineffective for failing to obtain and show to the jury a copy of a videotape containing footage taken at the accident scene. The post-conviction court held that the videotape did not rebut Trooper Lunceford's testimony or show the physical condition of the petitioner. It also observed that the "video was taken at night by a t.v. camera crew with lights flashing and people walking back and forth in every direction." In our view, the post-conviction court correctly found that the videotape would have offered little insight to the jury. Although the petitioner argues that the videotape would have confirmed that the headlights of the victims' vehicle were not on, the parties had already stipulated that fact. Further, in our view, the video would not have assisted the jury as to the petitioner's physical condition. Accordingly, trial counsel was not ineffective for failing to obtain and offer the content of the videotape at trial.

Finally, the petitioner contends that trial counsel was ineffective for failing to challenge the trial court's thirteenth juror finding on appeal. In support of his argument, he cites the following comments by the trial judge:

> I don't see much difference in a man riding down the street in a western town, shooting at random with a pistol in every direction and reloading it and doing it again than a man that will mix his drinking and taking of drugs and driving at the same time. He should expect to kill somebody. True that, in my opinion, the lights [on the victims' car] were not on . . . and it was at night. We don't know what would have happened if the lights had been on. [The petitioner] might or might not have hit them, but [the petitioner] was in no condition to drive, as the jury has found. . . .

(Emphasis added.)

Rule 33(f) of the Tennessee Rules of Criminal Procedure provides that a "trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." The purpose of the thirteenth juror rule is to be a "'safeguard . . . against a miscarriage of justice by the jury.'" State v. Moats, 906 S.W.2d 431, 434 (Tenn. 1995) (quoting State v. Johnson, 692 S.W.2d 412, 415 (Tenn. 1985)). The rule requires that the trial judge must be personally satisfied with the verdict. State v. Dankworth, 919 S.W.2d 52, 56 (Tenn. Crim. App. 1995).

In State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995), our supreme court acknowledged the restoration of the thirteenth juror rule as it existed at common law, thereby mandating that trial judges exercise the duty to function as a thirteenth juror in criminal cases. An order overruling a motion for new trial establishes a presumption that the trial court has exercised the duty and no explicit statement on the record is required. Carter, 896 S.W.2d at 122; see also State v. Robert Bacon, No. 03C01-9608-CR-00308 (Tenn. Crim. App., at Knoxville, Jan. 8, 1998). It is only when the trial court expresses dissatisfaction or disagreement with the jury verdict or makes statements indicating that it has absolved itself of its responsibility that the judgment should be set aside. See Bacon, slip op. at 19.

The state contends that the comments were mere "musings" and were not intended to reflect disagreement with the jury's verdict. Our review suggests that the statements made by the trial judge were in reference to consecutive sentencing. In reflecting upon the testimony, the trial court was contemplating the gravity of the crimes, not the sufficiency of the evidence. In our assessment, the trial court did not express dissatisfaction with the jury's verdict. Accordingly, trial counsel was not ineffective for failing to present the thirteenth juror issue on direct appeal.

Having considered each and every error that petitioner alleges to have been committed by trial counsel, it is our conclusion that even taken cumulatively, trial counsel's errors would not have affected the outcome of the trial. Accordingly, the petitioner is not entitled to relief on these grounds.

II

Next, the petitioner contends that the state violated Brady v. Maryland, 373 U.S. 83 (1963), by making the victims' vehicle unavailable for inspection by the defense. He argues that inspection of the vehicle could have resulted in corroboration of the theory that a third vehicle was involved in the crash and of the stipulation that the victims' headlights were not on at the time of the accident.

In the landmark case of Brady v. Maryland, 373 U.S. 83 (1963), the United States Supreme Court ruled that a prosecutor has a duty to furnish exculpatory evidence to the defendant upon request. Exculpatory evidence may pertain to the guilt or innocence of the accused and/or the punishment which may be imposed if the accused is convicted of the crime. State v. Marshall, 845 S.W.2d 228, 232 (Tenn. Crim. App. 1992). Any "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. Thus, the duty to disclose arises when the evidence is material, the evidence is favorable for the defense, and a proper request for production is made by the defendant. See United States v. Bagley, 473 U.S. 667 (1985); Strouth v. State, 755 S.W.2d 819, 828 (Tenn. Crim. App. 1986). Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about a defendant's guilt. United States v. Agurs, 427 U.S. 97 (1976).

Before this court may find a due process violation under Brady, the following elements must be established:

1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not);
2. the State must have suppressed the information;
3. the information must have been favorable to the accused; and
4. the information must have been material.

State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995) (as amended on rehearing).

Although the trial court made no specific findings on this issue, it is our view that the petitioner has failed to establish the elements necessary to establish a Brady violation. The record reflects only that the victims' vehicle was reported to have been crushed. The petitioner offered no proof regarding the circumstances surrounding the destruction of the vehicle. There was no testimony that the vehicle was in the state's custody or that the state had it destroyed. Nor is there any indication that an inspection of the vehicle by a defense expert would have yielded material information that was favorable to the accused. The headlamps were apparently inspected at some point insofar as the result was a stipulation by the parties that they were not on at the time of the accident. The defense expert concluded that the third vehicle involved in the crash was insignificant relative to the impact between the petitioner's vehicle and that of the victims. In our view, the

petitioner is not entitled to relief on this ground.

### III

Finally, the petitioner asserts that "[t]he appellate courts of this [s]tate should amend their rules" to provide sanctions for a trial court's failure to observe the mandatory time requirements of Tennessee Code Annotated section 40-30-211(d) and Rule 28 of the Supreme Court Rules of Post-Conviction Procedure." He complains about a fourteen-month delay between his evidentiary hearing in this case and the post-conviction court's order denying relief. The state contends that the petitioner received a full and fair hearing and that the trial court's delay in adjudicating the petitioner's numerous claims was in good faith.

Tennessee Code Annotated section 40-30-211(d) provides in pertinent part as follows:

> The court shall rule within sixty (60) days of conclusion of the proof. Such deadline shall not be extended by agreement, and such deadline may be extended only by order of the court based upon a finding that unforeseeable circumstances render a continuance a manifest necessity. Such extension shall not exceed thirty (30) days. Final disposition of a capital case must be made within one (1) year of the filing of the petition. . . .

Supreme Court Rule 28, section 9, contains the same mandates, i.e., that an order granting or denying post-conviction relief shall be entered no later than sixty days after the close of the proof, with no more than a thirty-day extension. Tenn. S. Ct. R. 28, § 9(A).

In Larry T. Carter v. State, No. 01C01-9710-CR-0048 (Tenn. Crim. App., at Nashville, Sept. 30, 1998), the petitioner claimed that he had been denied a full and fair post-conviction hearing due to an eleven-month delay between the hearing and the trial court's issuance of its order denying relief. This court nevertheless affirmed the denial, stating as follows:

> Nothing in the [P]ost-[C]onviction [P]rocedure [A]ct prescribes either a remedy or a sanction for a trial court's failure to comply with the time limits set out in [s]ection 40-30-211(d). Although we do not condone a failure to comply with the law as stated in [s]ection 40-30-112(d), we reject the notion that such an error in this case deprived Appellant of a full and fair hearing of his post-conviction claims. A full and fair hearing of post-conviction claims is a hearing wherein the petitioner is given every opportunity to present evidence and argument with respect to his claims. . . . Appellant was afforded such an opportunity in this case. The fact that the final order was entered in an untimely fashion does not detract from the full presentation of Appellant's claims to the courts. Therefore, this issue is without merit.

Slip op. at 4 (emphasis added) (citation omitted); see also Mirack R. Smith v. State, No. W1999-01566-CCA-R3-PC (Tenn. Crim. App., at Jackson, Dec. 5, 2000) (affirming post-conviction court's

denial of relief in spite of delay of two years and seven months between evidentiary hearing and issuance of order).

The petitioner's correctly contends that the delay between the hearing and the post-conviction court's order violated the time requirements of the statute. Nevertheless, the record reflects that the petitioner had a full and fair hearing. He does not allege any prejudice as a result of the delay. This court is without the authority to amend either the Post-Conviction Procedure Act or the applicable supreme court rules. In consequence, the petitioner is not entitled to relief on this issue.

Accordingly, the judgment of the post-conviction court is affirmed.

_____
GARY R. WADE, PRESIDING JUDGE